# Exhibit 1

<u>SERVICE AGREEMENT</u>

This Service Agreement (this "Agreement") is made and entered into as of _____, by and between Meg Sohmer Wood, PLLC (d/b/a Carolina Legal Services), a North Carolina professional limited liability company ("CAROLINA") and Carolina Client Services, LLC, a North Carolina limited liability company ("SERVICER").

WHEREAS, CAROLINA desires to retain SERVICER to provide marketing, administrative and non-legal law related services on behalf of and for the benefit of CAROLINA and its clients for its consumer credit card debt resolution business, as more particularly described in this Agreement, and subject in all cases to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

1. <u>Engagement of SERVICER</u>.

(a)   <u>General</u>. CAROLINA hereby engages SERVICER to provide the Services (as defined below), on behalf of and for the benefit of CAROLINA and the Applicable Clients (as defined below) of CAROLINA pursuant to the terms of this Agreement. SERVICER hereby accepts such engagement and agrees to provide such Services in accordance herewith.

(b)   <u>Applicable Clients</u>. For purposes hereof, the term "Applicable Clients" shall mean those clients generated by SERVICER who (i) have duly executed a retainer agreement with CAROLINA for consumer credit card debt resolution legal services; and (ii) are fulfilling all of their obligations under the retainer agreement and are not in breach of the same.

(c)   For purposes hereof, the "Services" to be provided by SERVICER under CAROLINA's direct supervision under this Agreement shall consist of the following:

(i) The provision and management of promotional and marketing services for the purpose of increasing the CAROLINA Applicable Client base and the goodwill and public image of the CAROLINA brand for consumer credit card debt resolution legal services;

(ii) The development and management of qualified leads to generate potential Applicable Clients for CAROLINA based on and in compliance with ethical and business criteria determined from time to time by CAROLINA and communicated to SERVICER in writing and/or by email correspondence; <u>provided</u> that SERVICER will not publish or disseminate any promotional, website or marketing materials designed to attract qualified leads for CAROLINA which have not been previously reviewed and approved by CAROLINA;

(iii)     The provision of administrative non-legal services as primary support staff of CAROLINA in connection with CAROLINA's consumer credit card debt resolution legal services business, including, but not limited to, Applicable Client enrollment, compliance with client qualification criteria, client support, client fee accounting, assistance with financial workout analysis, collection activities and debt restructuring, and the engagement of collectors on behalf of Applicable Clients in an effort to modify and settle unsecured debts; <u>provided</u>, that all such work shall be conducted by SERVICER under the direct and specific supervision of CAROLINA in compliance with guidelines and

procedures established by CAROLINA and all federal, state and local laws, rules, regulations, orders, and ethical requirements, including, but not limited to, American Bar Association Model Rules 5.4, 5.7 and 7.2 (collectively, "Legal Requirements"), pursuant to and in accordance with operational and control procedures determined from time to time by CAROLINA; and

      (iv)      Working directly with CAROLINA on periodic or remedial training, performance reviews and audits (both onsite and offsite) and satisfactorily resolving any compliance, operational or procedural deficiencies or other issues,

(d)      Carolina Actions. CAROLINA shall review, analyze, counsel and negotiate on collection activities and debt restructuring for Applicable Clients. CAROLINA shall monitor, approve and supervise the performance by SERVICER of the Services, pursuant to guidelines and procedures provided by CAROLINA from time to time in its discretion and communicated to SERVICER in writing and/or by email correspondence; provided, however, that employees of SERVICER will in no event be deemed to be employees of CAROLINA with respect to the provision of Services under any federal, state or local law or regulation.

(e)      No Legal Advice. Notwithstanding the provisions of Section I(c) or anything to the contrary in this Agreement, CAROLINA and SERVICER hereby acknowledge and agree that:

      (i) The monitoring, approval and supervision activities to be undertaken by CAROLINA for the Services provided by SERVICER shall not, and in no event, shall the same be deemed to, constitute the provision of legal advice by CAROLINA or its attorneys to SERVICER or its members;

      (i)      CAROLINA, its shareholders and attorneys shall have no liability to SERVICER or its members under or for any claim or legal theory based on the reliance of legal advice from CAROLINA, and none of SERVICER or its members shall make or assert any such claim or legal theory against CAROLINA, its shareholders or attorneys; and

      (ii)      SERVICER is not responsible for handling legal work for Applicable Clients pursuant to the retainer agreement between CAROLINA and Applicable Clients, and is in fact prohibited from providing legal advice and performing legal services, unless the duties are performed under the direct and specific supervision of CAROLINA.

(f)      Performance of Services. SERVICER shall comply with all Legal Requirements as determined and directed in writing and/or by email correspondence by CAROLINA from time to time for the administration of all Services performed hereunder. SERVICER shall provide and cause the Services to be provided in a professional and timely manner, including, but not limited to responding to all inquiries and handling all complaints by Applicable Clients in a timely fashion. During the term of this Agreement, SERVICER shall not conduct any business or operations other than the provision of the Services pursuant to this Agreement.

(g)      Intellectual Property Rights. During the term of this Agreement, CAROLINA hereby grants to SERVICER a limited, non-exclusive, royalty-free license within the United States of America, to use, reproduce, reformat, publicly display, and distribute the trademarks, trade dress and other content with respect to the name "CAROLINA" provided by CAROLINA to SERVICER for the purposes of

2

performing the Services, subject, in all cases, to the prior and continuing monitoring, auditing and approval by CAROLINA in its reasonable discretion of each instance of use by SERVICER thereof. CAROLINA will use its reasonable efforts to timely respond to all requests for such approval and outline the basis for all rejections. The license of intellectual property provided to SERVICER hereunder shall automatically terminate immediately upon the termination of this Agreement pursuant to its terms, and SERVICER shall have no further rights therein or thereto. The provisions of this Section I(g) shall survive the termination of this Agreement.

(h)  Restricted Jurisdictions. In the event that CAROLINA determines in its good faith reasonable discretion that CAROLINA shall no longer take fees from Applicable Clients in any particular jurisdiction on a prospective basis, then SERVICER hereby agrees that, upon the request of CAROLINA, it shall continue to provide Services under this Agreement to all Applicable Clients within such jurisdiction as of the date of such determination by CAROLINA subject to the provisions of subsection (j) below without charge for the duration of such clients' program. CAROLINA further agrees that should these circumstances arise, CAROLINA will cease accepting any new client in such jurisdiction until it is established that fees can be collected and both SERVICER and CAROLINA can be paid for such new Applicable Clients.

(i)  Continuing Service Obligation. Notwithstanding the provisions of subsection (i), if CAROLINA determines in its good faith reasonable discretion that CAROLINA shall no longer take fees from Applicable Clients in any particular jurisdiction on a prospective basis CAROLINA and SERVICER shall do the following: (i) if the total number of Applicable Clients for which there is an obligation to continue to service is under one hundred (100), then SERVICER shall provide such Services and otherwise handle its functions under this Agreement for free; (ii) if the number of consumers is one hundred (100) or more, the costs shall be allocated pro-rata between CAROLINA and SERVICER based upon the total amount of revenue realized by both CAROLINA and SERVICER in the jurisdiction at issue through the last date on which fees were permitted to be collected from the Applicable Clients, assuming a monthly cost of twenty-five dollars ($25.00) per consumer per month.

(j)  Settlement Negotiation Procedures. The terms of any proposed settlement of any Applicable Client's debt shall be sent by email, or other approved means, by SERVICER to the appropriate local counsel attorney retained by CAROLINA for approval and a record of such approval will become a part of the Applicable Client's file. If any creditor or creditor representative requires the participation of an attorney licensed or located in a particular jurisdiction for any Applicable Client debt negotiation, or as otherwise required by applicable legal or ethical obligations or requirements with which CAROLINA must comply, SERVICER will inform and include the retained local counsel for such jurisdiction in any such negotiation.

2.   Fees.

(a)  General. Subject to the provisions of this Section 2, CAROLINA shall pay SERVICER fees as compensation for the performance of the Services hereunder (collectively, the "Fee"). Additional program and payment options may be presented to Applicable Clients upon the prior written consent of CAROLINA and SERVICER. Such consent shall not be unreasonably withheld.

(b)  Elements of the Fee. In exchange for the provision of the Services by SERVICER for a particular Applicable Client, the elements of the Fee to be paid by CAROLINA to SERVICER are as follows:

3

(i)   If the total outstanding scheduled debt for an Applicable Client equals less than thirty thousand dollars ($30,000), then:

(A)   CAROLINA will pay to SERVICER a monthly administration fee of thirty-seven dollars ($37.00) per Applicable Client in partial consideration for the Services rendered by SERVICER hereunder, during the initial nine (9) months that such Applicable Client is in good standing with CAROLINA, subject to the payment provisions of Section 2(c);

(B)   CAROLINA will pay to SERVICER a monthly administration fee of forty-one and 25/100 dollars ($41.25) per Applicable Client in partial consideration for the Services rendered by SERVICER hereunder, beginning in the tenth (10th) month that such Applicable Client is in good standing with CAROLINA, and continuing monthly for the duration thereof, subject to the payment provisions of Section 2(c); and

(C)   CAROLINA will pay to SERVICER an additional amount equal to 17% of the total scheduled debt of each Applicable Client in partial consideration for the Services rendered by SERVICER hereunder, during the time period that such Applicable Client is in good standing with CAROLINA, in installments upon performance of debt resolution services by SERVICER to or for the benefit of such Applicable Client pursuant to this Section 2(b)(i), subject to the payment provisions of Section 2(c).

(ii)   If the total outstanding scheduled debt for an Applicable Client equals thirty thousand dollars ($30,000) or greater, then:

(A)   CAROLINA will pay to SERVICER a monthly administration fee of seventy-nine dollars ($79.00) per Applicable Client in partial consideration for the Services rendered by SERVICER hereunder, during the initial six (6) months that such Applicable Client is in good standing with CAROLINA, subject to the payment provisions of Section 2(c);

(B)   CAROLINA will pay to SERVICER a monthly administration fee of sixty dollars ($60.00) per Applicable Client in partial consideration for the Services rendered by SERVICER hereunder, for the seventh (7th), eighth (8th) and ninth (9th) months that such Applicable Client is in good standing with CAROLINA, subject to the payment provisions of Section 2(c);

(C)   CAROLINA will pay to SERVICER a monthly administration fee of sixty-eight and 50/100 dollars ($68.50) per Applicable Client in partial consideration for the Services rendered by SERVICER hereunder, beginning in the tenth (10th) month that such Applicable Client is in good standing with CAROLINA, and continuing monthly for the duration thereof, subject to the payment provisions of Section 2(c); and

(D)   CAROLINA will pay to SERVICER an additional amount equal to 17% of the total scheduled debt of each Applicable Client in partial consideration for the Services rendered by SERVICER hereunder, during the time period that such Applicable Client is in good standing with CAROLINA, in installments upon performance of debt resolution services by SERVICER to or for the benefit of such Applicable Client pursuant to this Section 2(b)(ii), subject to the payment provisions of Section 2(c).

4

(c)     Payment Terms.

(i)     CAROLINA will use one (1) or more payment processors to expedite the collection and distribution of the Fee. As more fully described below, CAROLINA agrees that any agreement with any payment processor responsible for collection of fees ("Processing Fee Agreement") must contain a provision that will prohibit such processor from withholding payments to SERVICER unless certain conditions as more fully described in Section 2(g) below exist; provided, however, that both CAROLINA and SERVICER acknowledge and agree that client trust account funds are the property of the Applicable Client. CAROLINA represents and warrants that it will never collect fees on its own, and will only collect fees through one or more independent payment processors. CAROLINA will authorize its payment processor to pay SERVICER the Fees for Services performed by SERVICER for an Applicable Client by ACH or wire transfer of immediately available funds, or as otherwise mutually agreed, not more than three (3) business days following the day on which the applicable portion of the Fee is received by such payment processor.

(ii)     In the event that CAROLINA is paid less than the full amount owing to CAROLINA by any Applicable Client, or the relationship between CAROLINA and a particular Applicable Client is terminated for any reason prior to the scheduled end of such Applicable Client's debt payment plan, then SERVICER shall only be entitled to payment from CAROLINA as compensation for the actual Services rendered by SERVICER to CAROLINA with respect to such Applicable Client, and to or on behalf of such Applicable Client, during the time period that such client was an Applicable Client in good standing of CAROLINA.

(iii)     The parties acknowledge and agree that CAROLINA will collect a portion of its fees from any Applicable Client over no less than eighteen (18) months of the applicable program thereof; provided that if the program length of a particular Applicable Client is less than eighteen (18) months, then CAROLINA will collect fees from such Applicable Client during the entire length of the program.

(d)     Unearned Fees. It is acknowledged and agreed by SERVICER that CAROLINA, following consultation with SERVICER as to the nature of the complaint, shall have the right, in its discretion, to pay to any Applicable Client a partial or full refund or credit of fees and costs paid to CAROLINA. In the event CAROLINA provides a full or partial refund of retainer and fees and costs, SERVICER will assist CAROLINA in the calculation of the reasonable value of the work previously performed by SERVICER for such Applicable Client. SERVICER shall not be deemed to have earned any Fees for any fees and costs which are subsequently returned, refunded or otherwise credited by CAROLINA to an Applicable Client ("Unearned Fees"). SERVICER shall pay to CAROLINA, within ten (10) days following demand therefor, any Unearned Fees, or, at CAROLINA's option, CAROLINA may deduct any such Unearned Fees from any sums due to SERVICER hereunder.

(e)     Audit Right. During the term of this Agreement, SERVICER shall have the right, upon reasonable advance notice during normal business hours, to audit and inspect (or have its accountants, attorneys or agents audit and inspect) the relevant books and records of CAROLINA to determine the accuracy and completeness of Fees paid pursuant to this Agreement. If SERVICER notifies CAROLINA that, based upon the findings of such audit, SERVICER believes that Fees payable to SERVICER are higher than the amount reported to SERVICER and paid by CAROLINA, the parties will attempt for

5

ninety (90) days in good faith to resolve such disagreement prior to the commencement of any legal action.

(f) <u>Tax Duties and Responsibilities</u>. SERVICER will be responsible for the payment of all state and local taxes and payments arising out of SERVICER's activities under this Agreement, and its receipt of Fees pursuant to this Section 2.

(g) <u>Processors</u>. CAROLINA will consult with SERVICER before any change in payment processors, and will decide upon payment processors based upon CAROLINA's determination of the best interests of its Applicable Clients. CAROLINA agrees that any payment processor must be independent of CAROLINA and SERVICER. The parties further agree that it may be advantageous to use separate processors for payment of fees and for consumer savings. The terms of any processing fee agreement must prohibit the freezing of any distribution of funds to SERVICER unless (i) this Agreement is terminated pursuant to the terms of Section 4, in which case the provisions of Section 4 shall govern, or (ii) (A) CAROLINA has provided to SERVICER and the payment processor a copy of the claim and demand for payment at least forty eight (48) hours in advance of any payment if such demand constitutes an Accelerated Set-Off Claim (as defined in Section 2(h)), or at least thirty (30) days in advance if such demand is based on the indemnification provision or contribution provision of this Agreement; (B) the amount requested is not greater than (l) the total obligation of SERVICER on the particular matter as set forth in this Agreement, less (2) the amount available to CAROLINA in the Escrow Account (as defined in Section 3(a)(i)) plus the amount (if any) SERVICER has already paid in respect of the applicable matter as of the date the demand is delivered to the payment processor; (C) the matter for which CAROLINA seeks such funds as set forth in the demand meets the definition of Accelerated Set-Off Claim or the requirements of the indemnification provision or contribution provision of this Agreement; and (D) in the event of an Accelerated Set-Off Claim, any one of CAROLINA, CAROLINA's owners, CAROLINA's attorney-members, attorney employees, attorney contractors or local attorneys, is a defendant party to the relevant action or suit. In the event that CAROLINA diverts funds from SERVICER as permitted under this Agreement, and SERVICER believes that CAROLINA is not entitled to the full amount that is being withheld from it and SERVICER exercises its dispute resolution rights under Section 9(f), then the expedited Judicial Arbitration and Mediation Service rules shall apply instead of the provisions set forth in Section 9(f), with the notice of arbitration and actual arbitration being completed in less than a month. All agreements with all payment processors hereunder shall explicitly name SERVICER as a third-party beneficiary. Notwithstanding anything to the contrary in this Section 2(g) or otherwise in this Agreement, both CAROLINA and SERVICER acknowledge and agree that client trust account funds are the property of the Applicable Client.

(h) <u>Accelerated Setoff Claim Definition</u>. For purposes of this Agreement, the term "Accelerated Set-Off Claim" shall mean (A) any action brought by any federal or state government, regulatory agency, bureau, division or similar body, state ethical body or by a private attorney with respect to any of the subject matter, facilitation, implementation or furtherance of this Agreement, the servicing of Applicable Clients by CAROLINA and/or SERVICER, the registration or qualification of CAROLINA and/or SERVICER under any state "debt adjuster law" or similar law, rule or regulation with respect to Applicable Clients, or (B) a violation alleged by any federal or state government, regulatory agency, bureau, division or similar body, state ethical body or by a private attorney of any state consumer protection law, consumer fraud law or similar law, rule or regulation with respect to Applicable Clients.

6

3. <u>Escrow</u>.

(a)     <u>Escrow Account Funds</u>.

(i) To provide a mechanism for the security of SERVICER's indemnification and/or contribution obligations under this Agreement for any Claim (as defined in Section 7(a)), funds will be deposited into a separate account of CAROLINA (the "Escrow Account") under the terms of this Section 3.

(ii)     Upon the execution hereof, SERVICER will make an initial deposit into the Escrow Account in an aggregate amount equal to One Thousand dollars ($1,000). For so long as SERVICER receives payment of the Fee, whether during the term of this Agreement or following its termination, CAROLINA is permitted to deposit, and SERVICER will otherwise cause to be deposited, one percent (1 %) (the "Escrow Rate") of each payment of the Fee hereunder that SERVICER would otherwise receive into the Escrow Account; <u>provided</u>, <u>however</u>, that following the four (4)-month anniversary of this Agreement, in the event the number of new Applicable Clients generated by SERVICER in any particular month from time to time ("Monthly Applicable Clients") is below one hundred forty (140) for three (3) consecutive months, the Escrow Rate shall increase to ten percent (10%) and shall continue at such amount until such time as the number of Monthly Applicable Clients is one hundred forty (140) or higher for three (3) consecutive months. Notwithstanding the foregoing, if CAROLINA contracts with a company owned at least in part by one or more principals of SERVICER to satisfy the indemnification and/or contribution obligations of SERVICER under this Agreement, then the Escrow Rate shall be one percent (1 %) for so long as such contract remains in force and effect regardless of the number of Monthly Applicable Clients.

(iii)     All investment earnings on the Escrow Account and all costs associated with establishing and maintaining the Escrow Account shall be held in, allocated to, and paid from, the Escrow Account.

(b) <u>Release of Escrow Account Funds</u>. The release of Escrow Account funds will be permitted and required upon any of the following events.

(i) Escrow Account funds will be released upon the joint written agreement of CAROLINA and SERVICER, on the date(s), in the amount(s) and to the party(ies) set forth in such joint written agreement. Each party shall act in good faith regarding the issuance of such instructions.

(ii) Escrow Account funds will be released to CAROLINA on the next business day following delivery by CAROLINA to SERVICER of written notice of a Claim, in the amount set forth in such notice. To be effective, such notice of a Claim must include:

7

(A)     A copy of the letter or other demand from a federal or state regulatory agency, ethical body or private party to an actual or potential Claim,

(B)     A written good faith assessment not intended to favor either party from outside legal counsel for CAROLINA with respect to the required retainer and/or budget amount necessary or advisable to appropriately and initially respond to and/or defend against such Claim, and

(C)     A calculation of the amount of such required retainer and/or budget amount allocable to SERVICER in accordance with the provisions of Section 7.

The copy of the notice delivered to SERVICER pursuant to this Section 3(b)(ii) will include an outline of the nature of the Claim to the extent known at such time.

(iii)     Escrow Account funds will be released to CAROLINA on the next business day following the delivery by CAROLINA to SERVICER of written notice of a judgment, settlement, or order of a regulatory or ethical body providing for or imposing upon CAROLINA any restitution, fine, damages and/or other payment, in the amount set forth in such notice. To be effective, such a notice must include:

(A)     A copy of the notice of judgment settlement or order at issue, and

(B)     A calculation of the amount of such restitution, fine, damages and/or other payment amount allocable to SERVICER in accordance with the provisions of Section 7.

The copy of the notice delivered to SERVICER pursuant to this Section 3(b)(iii) will include an outline of the basis of the judgment, settlement or regulatory order to the extent known at such time.

(c)     Replenishment. Notwithstanding the provisions of Section 3(b) above, following each release of Escrow Account funds to any recipient other than SERVICER for any reason, SERVICER will cause the balance of the Escrow Account to be replenished by causing to be deposited thirty percent (30%) of each payment of the Fee hereunder that SERVICER would otherwise receive into the Escrow Account until the amount so deposited equals the amount so released.

(d)     Return of Escrow Funds to SERVICER. Notwithstanding any other provision set forth in this Section 3 to the contrary, any funds remaining in escrow shall be returned to SERVICER in accordance with the provisions of this Section 3(d). When CAROLINA stops accepting new clients for debt resolution from SERVICER, it shall notify SERVICER. Twelve (12) months from such date, SERVICER shall calculate the number of active Applicable Clients (the 12-Month Client Number"). When the number of active Applicable Clients drops to ten percent (10%) or less of the 12-Month Client Number, then SERVICER will be eligible to begin receiving the amounts contained in the escrow. The balance shall be repaid in three (3) equal installments beginning as of the date when the active client count hits 10% of the 12-Month Client Number. The second and third installments will be paid

8

respectively twelve (12) and twenty-four (24) months after the first installment. If there is a claim made while the escrow balance is being distributed that would otherwise be paid from the escrow, then distribution shall continue unless the amount remaining in the escrow will be insufficient to cover the amount of the claim. Under such circumstances, the amount distributed shall be limited to the excess over the amount of the claim. If the entire escrow has been paid out, upon written notice, SERVICER will replenish the escrow in an amount equal to the shortfall needed to cover the claim.

(e)     Cap on Escrow Notwithstanding anything set forth herein to the contrary and subject to the claw back set forth herein, the total amount of fees held in escrow shall not exceed one million dollars ($1,000,000) If the escrow has been capped and more than one million dollars ($1,000,000) is needed to honor an obligation for which the escrow was intended, upon written notice including the documentation needed to prove the claim, SERVICER shall pay to CAROLINA the difference between what should have been deposited into the escrow but for the cap and what was deposited into the escrow. The funding of the escrow will then resume until the cap of one million dollars ($1,000,000) is then reached.

4.     Term and Termination.

(a)     Term of Agreement. This Agreement shall be effective as of the date hereof and shall continue in perpetuity until one of the parties elects to end this Agreement with or without Cause as more fully described below.

(b)     Without Cause Termination. Either party may end this Agreement without Cause upon four (4) months' advance written notice. During the notice period, SERVICER will have no obligation to try to market and locate new Applicable Clients, but will continue to process anyone presented to it as well as work on all Applicable Clients. Notwithstanding the foregoing, SERVICER must provide CAROLINA with at least four (4) additional months' advance written notice before it reduces its marketing efforts for new Applicable Clients from the normal level of such efforts during the term of this Agreement prior to giving such reduced-marketing advance notice; however, that any month in which the number of new Monthly Applicable Clients for such month is below fifty percent (50%) of the average of new Monthly Applicable Clients for the six (6) months prior to the giving of such reduced-marketing notice shall not count as one of the four additional months required for such reduced-marketing advance notice. Upon a termination of this Agreement without Cause by SERVICER, SERVICER shall, and shall cause its members to, work in good faith with CAROLINA to transition the provision of SERVICES on behalf of and for the benefit of Applicable Clients to CAROLINA or another entity at the direction of CAROLINA, and SERVICER shall have no further right to any Fee pursuant to this Agreement other than the reimbursement by CAROLINA of SERVICER's actual out-of-pocket costs incurred in connection with the transition to a replacement back-end processor, so long as such costs are not incurred for work which is a portion of the Services otherwise to be performed by SERVICER under this Agreement as set forth in Section I(c). Upon a termination of this Agreement without Cause by CAROLINA, SERVICER shall, and shall cause its members to, continue to provide Services to all then-existing Applicable Clients in accordance with this Agreement in exchange for the applicable Fee, and CAROLINA shall have no right to withdraw or remove any work from SERVICER, as long as SERVICER continues to provide Services in accordance with this Agreement, and such Services continue to be supervised by an appropriately licensed attorney. In such event, the provisions of this Agreement shall survive a termination by CAROLINA without Cause with respect to the provision of Services to the then-existing ApplicableClients.

9

(c) <u>Termination With Cause</u>. Each party shall have the right to end this Agreement for Cause upon written notice.

(i)     The parties intend that the standard for Cause is very high and only intended to apply to egregious behavior or situations. "Cause" by CAROLINA is defined as any of the following: (A) substantial and material breach of this Agreement by CAROLINA which, if capable of being cured, is not cured within thirty (30) days of written notice thereof; (B) CAROLINA becomes the subject of a voluntary or involuntary petition in bankruptcy or any proceedings relating to insolvency, receivership or liquidation, admits in writing its inability to pay debts generally as they come due, makes an assignment for the benefit of creditors, or ceases to do business as a going concern; or (C) if CAROLINA is prohibited or materially impaired by law or regulation from offering or providing the Services. "Cause" by SERVICER is defined as any of the following: (X) Substantial and material breach of this Agreement by SERVICER which, if capable of being cured, is not cured within thirty (30) days of written notice thereof; (Y) SERVICER becomes the subject of a voluntary or involuntary petition in bankruptcy or any proceedings relating to insolvency, receivership or liquidation, admits in writing its inability to pay debts generally as they come due, makes an assignment for the benefit of creditors, or ceases to do business as a going concern; or (Z) if SERVICER is prohibited or materially impaired by law or regulation from offering or providing the Services.

(ii)    Following a termination for Cause by CAROLINA initiated by SERVICER, SERVICER shall have the option to continue to provide Services to all then existing Applicable Clients in accordance with this Agreement in exchange for the applicable Fee, and CAROLINA shall have no right to withdraw or remove any work from SERVICER, as long as SERVICER continues to provide Services in accordance with this Agreement, and such Services continue to be supervised by an appropriately licensed attorney. In such event, the provisions of this Agreement shall survive a termination by SERVICER with Cause with respect to the provision of Services to the then-existing Applicable Clients. If in the judgment of a regulator, as set forth in writing or in an opinion from a neutral law firm acting in good faith (that is an expert in this field), it is determined that continuing the affiliation will cause irreparable harm, SERVICER has the other option to cease providing Services and to receive seventy-five percent (75%) of the fees described in Section 2(b)(i)(C) or Section 2(b)(ii)(D) (as applicable) as and to the extent such fees are paid to CAROLINA by Applicable Clients following such termination.

(iii)   Following a termination for Cause by SERVICER initiated by CAROLINA, SERVICER shall, and shall cause its members to, work in good faith with CAROLINA to transition the provision of SERVICES on behalf of and for the benefit of Applicable Clients to CAROLINA or another entity at the direction of CAROLINA, and SERVICER shall receive twenty-five percent (25%) of the fees described in Section 2(b)(i)(C) or Section 2(b)(ii)(D) (as applicable) as and to the extent such fees are paid to CAROLINA by Applicable Clients following such termination.

(d) <u>Termination Due to Legal Requirement</u>. Each of CAROLINA and SERVICER shall have the right to terminate operations with respect to Applicable Clients and potential clients in any particular state, but only with respect to such state, immediately upon delivery of written notice to the other party in the event that a non-appealable judgment from a court of competent jurisdiction determines CAROLINA or SERVICER to be in violation of any law, rule, regulation or order of such state related to

10

the provision of debt resolution services, and such party is unable to revise its business practices to comply with such state law, rule, regulation or order.

5. <u>Restrictions and Covenants.</u>

(a) <u>SERVICER.</u> While this Agreement is in effect and for one (1) year thereafter (the "Restricted Period"), SERVICER hereby agrees that it shall not, directly or indirectly, (i) provide or otherwise assist in the provision of any services which are the same or similar to any of the Services hereunder to or for the benefit of any lawyer or law firm other than CAROLINA or its related or affiliated companies, for the conduct of business in any location within the United States of America in which CAROLINA conducted business during the one (1)-year period prior to the termination of this Agreement; or (ii) (A) recruit or solicit for the purpose of hiring or engaging as an independent contractor, or hire, employ or engage as an independent contractor, any person or entity employed or engaged as an independent contractor by CAROLINA or its related or affiliated companies, within six (6) months prior to the date of such solicitation, employment or engagement; or (B) hire, retain the services of, or otherwise engage in a contractual relationship with any attorney or paralegal with whom CAROLINA, at any time within six (6) months prior to the date of such action, had a written contractual relationship; provided, however, that the restrictions set forth in this Section 5(a) shall not apply to the hiring, employing or engaging of Global Client Solutions, LLC (or any successor), Reliant Account Management (or any successor), National Data Systems LLC (or any successor), Michael Thurman, Esq., or any person who works in SERVICER's office in New York, New York, or in SERVICER's branch office in New Jersey. Notwithstanding the foregoing, the Restricted Period with respect to the hiring, employing or engaging of any paralegal company or network utilized by CAROLINA, including but not limited to National Paralegal & Notary (or any successor), Professional Settlement Services (or any successor), Sunshine Signing Connection, Inc. (or any successor), NotaryGo, Inc. (or any successor), or Express Notary Service, Inc. (or any successor), shall terminate as of the termination of this Agreement in the event that the Service Agreement is terminated by SERVICER for Cause or by CAROLINA without Cause. SERVICER agrees and acknowledges that in the event of any violation of any obligation set forth in this Section 5(a), the time period applicable to such obligation shall be extended by a period of time equal from the date the activity constituting such violation began through the date the activity or activities constituting such violation terminated.

(b) <u>CAROLINA.</u> During the Restricted Period, CAROLINA hereby agrees that it shall not, directly or indirectly, recruit or solicit for the purpose of hiring or engaging as an independent contractor, or hire, employ or engage as an independent contractor, any person or entity employed or engaged as an independent contractor by SERVICER or its related or affiliated companies, within six (6) months prior to the date of such solicitation, employment or engagement; provided, however, that the restrictions set forth in this Section 5(b) shall not apply to the hiring, employing or engaging of Global Client Solutions, LLC (or any successor), National Data Systems LLC (or any successor), any paralegal company or network utilized by CAROLINA, including but not limited to National Paralegal & Notary (or any

11

successor), Professional Settlement Services (or any successor), Sunshine Signing Connection, Inc. (or any successor), NotaryGo, Inc. (or any successor), or Express Notary Service, Inc. (or any successor). CAROLINA agrees and acknowledges that in the event of any violation of any obligation set forth in this Section 5(b), the time period applicable to such obligation shall be extended by a period of time equal from the date the activity constituting such violation began through the date the activity or activities constituting such violation terminated.

(c)    <u>Acknowledgement</u>. It is the parties' intent that each of the terms, provisions and restrictions contained in this Section 5 be read and interpreted with every reasonable inference drawn in favor of its enforceability. However, it is also the parties' intent that if any term, provision or restriction contained in this Section 5 is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions thereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Finally, it is also the parties' intent that if a court of competent jurisdiction should determine that all or part of any term provision or restriction contained in this Section 5 is unenforceable due to over-breadth, then such court shall modify all or part of said term, provision or restriction to the minimum extent necessary to make it enforceable under the prevailing circumstances.

(d)    <u>Enforcement by Injunction</u>. Each of CAROLINA and SERVICER acknowledges that (i) the protections set forth in this Section 5 are of vital concern to the parties hereto, that monetary damages for any violation thereof would not be adequate compensation, and that the restrictions set forth herein will not prevent any of such parties from conducting business, and (ii) the covenants set forth in this Section 5 are a vital part of the negotiations between the parties, and that no party would have entered into this Agreement without agreement thereto. Accordingly, each of CAROLINA and SERVICER agrees that the restrictions set forth in this Section 5 are reasonable in terms of duration and scope and that, in addition to any other remedy, such restrictions may be enforced by injunction proceedings (without the necessity of posting bond) to preserve the status quo, restrain a violation thereof and to compel specific performance with respect thereto, whether or not this Agreement has terminated.

6.    <u>Confidentiality</u>

(a)    <u>Confidential Information</u>. Each party agrees to keep confidential, and will not use for any purpose other than for the provision of Services under this Agreement, all Confidential Information received from the other party or Applicable Clients. As used herein, the term "Confidential Information" means all non-public information of SERVICER, CAROLINA or Applicable Clients (whether written, oral or in another medium) provided by a party to this Agreement or an Applicable Client, or of which a party comes into possession, and all notes, analyses or other material prepared by a party containing or based, in whole or in part, on any such Confidential Information, other than information which (i) can be demonstrated as being known to the receiving party at the time of disclosure, (ii) is or becomes publicly known through no wrongful act of the receiving party, or (iii) has been rightfully received by the receiving party from a third party who is authorized to make such disclosure. In the event of any legal action or proceedings or asserted requirement under applicable law or government regulations calling for disclosure by the receiving party of Confidential Information, such party will notify the other and, upon request, will cooperate in contesting such disclosure. Upon request, each party will promptly deliver all copies of Confidential Information in its possession to the other. In the event that it is impossible to return any Confidential Information (e.g., information maintained on a hard drive of a computer), each party will cause all such Confidential Information to be destroyed or permanently erased.

12

(b)   Compliance with Legal Requirements. Each of CAROLINA and SERVICER shall maintain, and shall cause its respective employees and agents to maintain, the confidentiality and security of Applicable Clients' personal information that is not public as required by Legal Requirements relating to the privacy and security of customer information, including, but not limited to, the Gramm-Leach-Bliley Act.

(c)   Enforcement by Injunction. Each of CAROLINA and SERVICER acknowledges that (i) the protections set forth in this Section 6 are of vital concern to the parties hereto, that monetary damages for any violation thereof would not be adequate compensation, and that the restrictions set forth herein will not prevent either of CAROLINA or SERVICER from conducting business, and (ii) the covenants set forth in this Section 6 are a vital part of the negotiations between the parties, and that no party would have entered into this Agreement without agreement thereto. Accordingly, each of CAROLINA and SERVICER agrees that the restrictions set forth in this Section 6 are reasonable in terms of duration and scope and that, in addition to any other remedy, such restrictions may be enforced by injunction proceedings (without the necessity of posting bond) to preserve the status quo, restrain a violation thereof and to compel specific performance with respect thereto, whether or not this Agreement has terminated.

7.   Indemnification and Contribution.

(a)   Claims. CAROLINA and SERVICER have agreed to certain indemnification and contribution obligations for any action brought by any federal or state regulatory agency, ethical body or by private action for any action brought by any federal or state government, regulatory agency, bureau, division or similar body, state ethical body or by a private party with respect to any of the subject matter, facilitation, implementation or furtherance of this Agreement, the servicing of Applicable Clients by CAROLINA and/or SERVICER, the registration or qualification of CAROLINA and/or SERVICER under any state "debt adjuster law" or similar law, rule or regulation with respect to Applicable Clients, or an alleged violation of any state consumer protection law, consumer fraud law or similar law, rule or regulation with respect to Applicable Clients (each, a "Claim").

(b)   Indemnification by SERVICER. SERVICER shall indemnify CAROLINA and its affiliates, shareholders, directors, officers, employees, attorneys and agents (collectively, CAROLINA Indemnified Parties"), and save and hold each of them harmless from and against and pay on behalf of or reimburse each of the CAROLINA Indemnified Parties as and when incurred for any loss, liability, obligation, fine, penalty, damage, deficiency or cost of third-party investigation, and any actions, judgments, fees, costs and expenses (including, but not limited to, reasonable attorneys' and paralegals' costs and fees, and all other expenses incurred in investigating, preparing for or defending any action, demand, proceeding, investigation or claim) incident to any of the foregoing (collectively, "Damages") arising from:

(i)   any breach or violation of any representation, warranty, obligation or other provision of this Agreement by SERVICER or any of its members, and any action, demand, proceeding, third-party investigation or claim by any third party (including federal and state governmental authorities, regulatory or ethical bodies, and private actions) against or affecting any of the CAROLINA Indemnified Parties which, if successful, would evidence such a breach or violation; and

(ii)   Any action, demand, proceedings, third-party investigation or claim by any third party (including, but not limited to, federal and state governmental authorities, regulatory or

13

ethical bodies, and private actions) arising from SERVICER's conduct of its operations or business before the date of this Agreement.

(c)    <u>Indemnification by CAROLINA</u>. CAROLINA shall indemnify SERVICER and its affiliates, members, equity-holders, managers, directors, officers, employees, and agents (collectively, "SERVICER Indemnified Parties"), and save and hold each of them harmless from and against and pay on behalf of or reimburse each of the SERVICER Indemnified Parties as and when incurred for any Damages arising from:

(i)    Any breach or violation of any representation, warranty, obligation or other provision of this Agreement by CAROLINA, and any action, demand, proceeding, third-party investigation or claim by any third party (including federal and state governmental authorities, regulatory or ethical bodies, and private actions) against or affecting any of the SERVICER Indemnified Parties which, if successful, would evidence such a breach or violation; and

(ii)    Any action, demand, proceedings, third-party investigation or claim by any third party (including, but not limited to, federal and state governmental authorities, regulatory or ethical bodies, and private actions) arising from CAROLINA's conduct of its operations or business before the date of this Agreement.

d)   <u>Indemnification Procedures</u>.

i) Each of CAROLINA and SERVICER shall give the other prompt written notice of any Claim or other matter as to which it believes the indemnification provisions of this Agreement are or may be applicable. Any failure by a party seeking indemnification hereunder to give timely, complete or accurate notice as provided in this Section 7(d)(i) will not affect the rights or obligations of any party hereunder except and only to the extent that, as a result of such failure, the party entitled to receive such notice was deprived of its right to recover any payment under its applicable insurance coverage or was otherwise directly and materially damaged as a result of such failure to give timely notice.

(ii) The party required to provide indemnification under this Agreement (the "Indemnifying Party") shall have the right, upon written notice to the party entitled to indemnification under this Agreement (the "Indemnified Party") within ten (10) business days after receipt of the notice of a Claim, which written notice (the "Defense Notice") shall specify the counsel to be appointed to defend such Claim ("Defense Counsel"), to conduct at its expense the defense against such Claim in its own name, or, if necessary, in the name of the Indemnified Party; <u>provided</u>, <u>however</u>, that the Indemnified Party shall have the right to approve the Defense Counsel in its discretion. Notwithstanding the foregoing, the Indemnifying Party shall not be entitled to assume control of the defense of a Claim and shall pay the reasonable fees and expenses of counsel retained by the Indemnified Person, if:

(A)    The Claim seeks injunctive or other equitable relief against the Indemnified Person or involves criminal allegations,

14

(B)     The Claim would operate as res judicata or collateral estoppel for other non-indemnifiable claims which would have a material adverse effect on the business, financial condition, operations or prospects of the Indemnified Party,

(C)     The Claim imposes liability on the Indemnified Party for which the Indemnified Party is not entitled to indemnification hereunder,

(D)     The Indemnified Party, by written notice to the Indemnifying Party, states that, based on advice of counsel, applicable principles of legal ethics would prohibit a single legal counsel from representing both the Indemnified Party and the Indemnifying Party because the Indemnified Party reasonably believes that its interests in the Claim are or can reasonably be expected to be adverse to the interests of the Indemnifying Party, or

(E)     The Indemnifying Party is unable to provide the Indemnified Party with reasonable assurance of its ability to pay the expenses of the defense against such Claim.

iii)  In the event that the Indemnifying Party shall fail to give the Defense Notice within the time period described above, it shall be deemed to have elected not to conduct the defense of the subject Claim, and in such event the Indemnified Party shall have the right to conduct such defense in good faith and the Indemnifying Party will be liable for all costs, expenses, settlement amounts or other Damages paid or incurred in connection therewith. If the Indemnifying Party is not entitled to assume the defense of a Claim because of reasons set forth in Section 7(d)(ii), the Indemnifying Party may not settle the Claim without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed, if such settlement would lead to any material liability or create any other material obligation of the Indemnifying Party.

iv)  If Indemnifying Party does deliver a Defense Notice within the time period described above and thereby elects to conduct the defense of the subject claim, the Indemnifying Party shall diligently conduct such defense and the Indemnified Party will reasonably cooperate with and make available to the Indemnifying Party such assistance and materials as it may reasonably request, all at the expense of the Indemnifying Party, and the Indemnified Party shall have the right at its expense to participate in the defense assisted by counsel of its own choosing.

v) The Indemnifying Party may enter into any settlement of any Claim; provided, however, the Indemnifying Party may not enter into any settlement of any Claim without the prior written consent of the Indemnified Party if pursuant to or as a result of such settlement, (l) injunctive or other equitable relief would be imposed against the Indemnified Party, or (2) such settlement would or could reasonably be expected to lead to any material liability or create any other material or monetary obligation of the Indemnified Party.

vi)  Any final judgment entered or settlement agreed upon in the manner provided herein shall be binding upon the Indemnifying Party, and shall conclusively be deemed to be an obligation for which the Indemnified Party is entitled to prompt indemnification hereunder.

e)   Contribution.

15

(i)     Acknowledgement. It is acknowledged by CAROLINA and SERVICER that the providing of legal and non-legal services for debt resolution is subject to ongoing state and federal regulatory review and potential update. In addition, it is acknowledged that CAROLINA, as a law firm, is subject to ethical rules, standards and requirements in numerous states as well as regulatory rulings and restrictions that may apply to the subject matter of this Agreement for marketing and implementation of professional work.

(ii)     Contribution Obligation. In the event of any Claim for which neither CAROLINA nor SERVICER is entitled to indemnification from the other party pursuant to Section 7(b) or 70, as applicable, each of CAROLINA and SERVICER shall be liable and responsible to the extent of their respective Proportionate Share (as defined below) for all Damages arising from or for such Claim. CAROLINA shall give SERVICER prompt written notice of any Claim or other matter as to which it believes the contribution provisions of this Agreement are or may be applicable. SERVICER shall have the right, within thirty (30) days of such notice, to dispute that the Claim or other matter is subject to the contribution provisions of this Agreement. In the event either of CAROLINA or SERVICER is required to pay any Damages for any Claim, then each of CAROLINA and SERVICER hereby agrees to pay an amount equal to its Proportionate Share of the payment required. In the event either of CAROLINA or SERVICER pays more than its Proportionate Share of such amount, the party to this Agreement whose payment was less than its Proportionate Share shall reimburse the other party to this Agreement whose payment was above its Proportionate Share for the amount by which the applicable party's payment was less than its Proportionate Share of the amount owing.

(f)     Proportionate Share. For purposes hereof,

(i) The "Proportionate Share" of CAROLINA with respect to a particular Claim shall mean that percentage of the total revenue actually received by CAROLINA with respect to the Applicable Clients, geographic location and/or matter at issue under such Claim over the dates covered by such Claim (the "Claim Matter"), otherwise retained by CAROLINA and not paid as a Fee under this Agreement to SERVICER attributable to such Claim Matter; and

(ii) The "Proportionate Share" of SERVICER for a particular Claim Matter shall mean that percentage of the total revenue actually received by CAROLINA for a particular Claim Matter paid to SERVICER as a Fee under this Agreement attributable to such Claim Matter.

(g) Indemnification and Contribution Payments. Subject to the provisions set forth in Section 2(i), any payment pursuant to a claim for indemnification or contribution shall be made no later than forty-five (45) days after receipt by the Indemnifying Party or contributing party of written notice which states the amount of the claim and includes documentation outlining the nature of the Claim and copies of relevant invoices or other documentation that reasonably evidences the request for indemnification or contribution. In addition, the Indemnifying Party or contributing party shall reimburse the party seeking such indemnification or contribution payment for all costs or expenses of any nature or kind whatsoever (including, but not limited to, reasonable attorneys' and paralegals' costs, fees and expenses) incurred in seeking to collect any payments under this Section 7. Subject to the limitations set out elsewhere in this Agreement and the obligation of CAROLINA to exercise good faith, CAROLINA shall have the right, at its option, to set off against any payment due to SERVICER pursuant to this Agreement, any and all amounts for which SERVICER are required to indemnify an Indemnified Party or contribute to CAROLINA pursuant to this Section 7.

16

8. <u>Representations and Warranties</u>. Each of CAROLINA and SERVICER represents and warrants to the other party that (a) such party has the full right, power and authority to execute, deliver and perform its obligations under this Agreement in accordance with the terms hereof; (b) this Agreement has been duly and validly executed and delivered by such party and constitute the valid and binding obligation of such party enforceable in accordance with its terms; and (c) the execution, delivery and performance of this Agreement by such party will not violate or conflict with any contract, agreement, or order to which such party is subject.

9. <u>General Provisions</u>.

    (a)    <u>Neutral Reading</u>. It is the intent of the parties that this Agreement be deemed to have been prepared by all parties hereto and that the language used in this Agreement be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any party.

    (b)    <u>Relationship of Parties</u>. Nothing in this Agreement may be construed or interpreted as constituting either party hereto as the partner, agent, principal, employee, employer or joint venturer of the other party. Each of CAROLINA and SERVICER is an independent contractor. Neither party may assume, either directly or indirectly, any liability of or for the other party. Neither party has the authority to bind or obligate the other party, and neither party may represent that it has such authority. The parties do not contemplate or intend in any way a sharing of profits relating to the legal work provided by CAROLINA to Applicable Clients.

    (c)    <u>Amendment Waiver</u>. This Agreement may not be altered or modified, except by written amendment which expressly refers to this Agreement and which is duly executed by authorized representatives of both parties. The waiver or failure by either party to exercise or enforce any right provided for in this Agreement shall not be deemed a waiver of any further right under this Agreement.

    (d)    <u>Interpretation</u>. The preamble and recitals contained in this Agreement are incorporated herein by reference and made a part hereof. Headings are inserted herein for convenience of reference only and are to be ignored in construing this Agreement.

    (e)    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina without reference to the conflicts of law principles thereof.

    (f)    <u>Arbitration</u>. Each signatory hereto hereby agrees that in the event of any dispute arising out of or by reason of this Agreement or the Services rendered or contemplated hereunder, or any other disagreement of any nature, type or description regardless of the facts or legal theories which may be involved, such dispute shall be resolved by confidential binding arbitration before American Arbitration Association ("AAA"), pursuant to the Federal Arbitration Act (9 U.S.C. 1, et seq.). Such dispute will be submitted to confidential binding arbitration only in Charlotte, North Carolina. Arbitration proceedings may be commenced by any signatory to this Agreement by giving the other parties hereto written notice thereof, and the proceedings shall be governed by the rules of AAA. The arbitrator's award in any such

17

proceeding shall be final and binding, and a judgment upon such award may be enforced by any court of competent jurisdiction. Each signatory hereto hereby agrees to submit to the jurisdiction of any state or federal court sitting in Charlotte, North Carolina in any action or proceeding arising out of or relating to the enforcement of the arbitration provisions of this Agreement. Each signatory hereto hereby agrees to waive any defense of inconvenient forum to the maintenance of any action or proceeding so brought in Charlotte, North Carolina, and each signatory hereto waives any bond, surety, or other security that may be required of any other signatory with respect thereto. Notwithstanding the foregoing, as set forth elsewhere in this Agreement, there is a limited expedited right of arbitration.

(g)     Costs and Expenses. The party prevailing in any arbitration or other proceeding under this Agreement shall be entitled to recover the reasonable costs and expenses incurred in connection therewith, including, but not limited to, reasonable attorneys' and paralegals' fees, costs and expenses.

(h)     Severability. The various terms, provisions and covenants herein contained shall be deemed to be separable and the invalidity and unenforceability of any of them shall in no manner affect or impair the validity or enforceability of the remainder thereof.

(i)     Further Assurances. Each of parties shall execute and deliver all such other instruments and take all such other actions as such other party may reasonably request from time to time in order to effectuate the purposes of this Agreement.

(j)     Entire Agreement. This Agreement constitutes the entire agreement of the parties for the transactions contemplated hereby, and there are no other prior or contemporaneous written or oral communications, agreements, undertakings, provisions, warranties, or covenants not contained or expressly incorporated herein.

(k)     Binding Agreement. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns; provided, however, that SERVICER may not assign this Agreement or any of its rights, benefits or obligations hereunder without the prior written consent of CAROLINA in its discretion.

(l)     Survival. The rights and obligations contained in Sections 1(g), 2(c), 2(d), 2(f), 3(b), 4, 5, 6, 7, 8 and 9 shall survive any termination of this Agreement.

(m)     Notices. All notices and other communications hereunder shall be sufficiently given and effective for any purpose hereunder only upon delivery by personal service or prepaid overnight delivery, in each case to the persons and addresses indicated below.

If to CAROLINA:

Meg Sohmer Wood
3440 Toringdon Way, Suite 205
Charlotte, NC 28277


If to SERVICER:

Carolina Client Services, LLC
711 Third Avenue

6th Floor
New York, NY 10017

(n)     Counterparts: Delivery. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed to be one Agreement. This Agreement and any amendment hereto, to the extent signed and delivered by means of a facsimile machine or by electronic mail, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

[signature page follows]

19

IN WITNESS WHEREOF, the parties have caused this Servicing Agreement to be signed and effective as of the date first above written.

Meg Sohmer Wood, PLLC (d/b/a Carolina Legal Services)

Name: Meg Sohmer-Wood
Title: Manager.

Carolina Client Services, LLC

By:

Name:

Title: